FRANCIS B. BOHLSEN, ET AL. *v.* MARY BOHLSEN, ET AL.

[Abstract Kentucky Law Reporter, Vol. 5—613.]

**Testamentary Capacity.**

A change of purpose is not of itself conclusive of an unsound mind, but a change which is just and reasonable is evidence that a testator is in possession of all his mental faculties.

**Evidence.**

>　For evidence held insufficient to establish unsoundness of mind of a testator, see opinion.

**Instruction.**

>　It is the duty and province of the court to instruct the jury what condition or quality is sufficient to constitute a sound mind.

**Instruction—Continued.**

>　An instruction is not erroneous which charges that the degree of soundness of mind required by law to enable a person to make a will is capacity sufficient to know his relations and the extent and character of his estate, and to dispose of the same in a rational manner according to a fixed purpose of his own.

APPEAL FROM JEFFERSON COURT OF COMMON PLEAS.

January 19, 1884.

Opinion by Judge Lewis:

This is an appeal from the judgment of the Louisville Chancery Court rendered in accordance with the verdict of the jury finding papers dated August 16, 1876, and November 30, 1880, to be the true last will and testament and codicil of Theodore Bohlsen, Sr., deceased. The appellants, contestants, are the children of John Bohlsen and Wendelina Tillman, residuary devisees under the sixth clause of the will made in 1876, and the appellees, propounders, are Mary Bohlsen, widow and executrix, and also administratrix with the will annexed, of Theodore Bohlsen, Jr., deceased, and the children of Abel Bohlsen, devisees under the last mentioned will.

The validity of the will made in 1876 does not appear to be disputed, but appellants contend that the testator was not of sound mind at the date of the alleged codicil thereto and that it is not his true last will nor any part thereof. By the will the testator devised to the Roman Catholic Bishop of the Diocese of Kentucky presiding at the time of his, the testator's death a lot of land in the city of Louisville, and $3,000 in money to be expended in aid of the erection of a church building on the lot. But it was provided that the gift should be void in case the church was not commenced within fifteen years after his death. To his wife he devised certain personal property, a house and lot, and the income arising from his bank stock and from the rent of designated real property. The

residue of his real and personal estate he devised to his only child, Theodore Bohlsen, Jr. But by the sixth clause of the will it was provided that in case his son should die before he arrived at the age of twenty-five years without lawful issue of his body all the property devised to him should go to the children of the testator's brother, John Bohlsen, and the children of his sister, Wendelina Tillman, except that in case his son left at his death a widow she should have for life a designated house and lot.

The codicil dated November 30, 1880, is as follows: "My son, Theodore, being now near twenty-five years of age and having proved himself competent to take care of his estate, I hereby revoke the sixth item of my foregoing will, and instead of giving him the residue of my property on arriving at the age of twenty-five years I hereby give him the same absolutely whether he should die with or without issue, and revoke that portion of said sixth clause which gives the property to the other parties therein named in case of his death before the age of twenty-five years without leaving issue. This I make as a codicil to my will dated 16th of August, 1876." The testator died December 4, 1880, and the will and codicil were on the 15th of the same month admitted to record by the Jefferson County Court.

April 22, 1881, Theodore Bohlsen, Jr., made and published his last will and died soon thereafter without issue and before arriving at the age of twenty-five years. By his will, which was admitted to record May 23, 1881, he gave to the Catholic Bishop of the Diocese of Kentucky the lot and the $3,000 in money mentioned in the will of his father, the only condition as to the lot being that if no church building shall be erected thereon within fifteen years his executor must sell the lot and pay the proceeds to the Bishop, and that the money must be held in trust for the use of any Catholic congregation erecting or building upon the lot, or in case none should be built then for the use of the Catholic congregation nearest to the lot. In addition to the house and lot given to his mother by the will of his father he devised to her another house and lot and the net income during her life of his real estate. The residue of his real estate he devised as follows: One-third to the children of John Bohlsen, one-third to the children of Abel Bohlsen, and one-third to the children of Lena Bohlsen, called Wendelina Tillman

in the will of his father, and the residue of his estate of whatever kind, except certain specific devises, he gave to his mother.

As Theodore Bohlsen, Jr., died without issue and before he arrived at the age of twenty-five years, the efficiency of the disposition made in his will of the estate derived from his father depends upon whether the codicil be established or not, and to that extent is his will drawn in question and appellees affected by this appeal. The evidence shows that Theodore Bohlsen, Sr., was a man, when in health, of strong will and great firmness, and possessed of much more than ordinary vigor, clearness and strength of intellect, and by reason of these sterling qualities, aided by his wife, accumulated a large estate. But two persons, the subscribing witnesses, testified at the trial as to his mental condition at the time the codicil was made. One of the witnesses, Clemmons, who wrote the codicil, testifies that he had been for many years the legal adviser of the testator and was well acquainted with him, and that at the time the codicil was made he was of sound mind and understood perfectly what he was doing. He stated that he was sent for by the testator, and when he arrived at his house was informed by him that he believed he was going to die, and giving substantially the same reasons therefor which are set forth in the codicil said he desired the witness to make an alteration and addition to his will, and asked him if it could not be done by a codicil. But the witness stated that, as is his habit in such cases, in order to be assured as to the mental capacity of the testator, he conversed with him some time before writing the codicil. The subjects and substance of that conversation, which was entirely rational, consistent and clear on the part of the testator, were detailed by the witness to the jury. He stated farther that he first wrote the codicil in pencil as dictated by the testator, and then read it over to him carefully and slowly as written, when he said it was exactly as he wanted it, and after it was copied in ink said it was all right. When told that it was necessary to have two witnesses to it he directed his son to go out and get some one to witness it with Clemmons.

If the conversation and conduct of the testator, all of which it is not necessary to repeat here, are truthfully related by this witness, of whose intelligence or veracity the record furnishes no reason to doubt, the obvious conclusion to be drawn therefrom is that the testator was at the time of sound mind, and not only under-

stood the meaning and effect of the codicil, but made it of his own volition in pursuance of a clearly defined and fixed purpose to make the change in his will that was accomplished by it.

Two other witnesses were called by the propounders to testify as to the mental condition of the testator, both of whom stated that he was entirely rational. One of them was his widow, one of the appellees, and the other was the Catholic priest who administered the last rites of the church to him, and who was with him on two occasions about the time the codicil was made, once at night when Abel Bohlsen was present and once in the day time, but whether on the same day it was made is not distinctly stated.

Abel Bohlsen, the other subscribing witness, was called by the contestants. He testified that he was with the testator the night before the codicil was made, that he was sick, confined to his bed, was restless, and said he felt he must die; that when asked if there was anything on his mind he remarked it was too late, that he had promised some money, two or three thousand dollars, to the church and had made some provision for it in his will, but did not know whether it was, in the language of the witness, positive or not. The witness being asked the question, stated that the testator did not on that occasion say anything that led him, the witness, to believe that his mind was wandering in any way, but he did not recollect how much he had promised the church. This witness does not state that he was present when the conversation took place between the testator and Clemmons, as detailed by the latter; nor does it appear that he was there until after the codicil was written. He began his recital of what occurred by stating that the testator when asked the question answered that the codicil was the way he wanted it, and continuing said that then he, Clemmons, gave him the will to sign it. He raised him up somewhat in the bed and handed him a pen and he started to write it. The "Bo" he got pretty well. He forgot the "h" and the balance he got mixed up. There was no "s" and no "n." He had that wrong. "I could not describe how he had it exactly. I remember distinctly about calling the 'h' to him, and he called it after me but he looked like he didn't remember. So I called them off one after another for him to put down."

When asked the question if in his opinion the testator then had sufficient mental capacity to take a survey and know what property and estate he had to hold it in his mind and make a rational dispo-

sition of it according to a fixed purpose of his own, the witness answered that he "did not think he had a right good recollection of what he was doing then, that he could not tell exactly how his mind was, but did not think his remembrance was good then, that he could not recollect everything."

No conversation was had with the testator by this witness on that occasion except what has been mentioned; nor does he state that any other transaction than the one referred to then occurred upon which to found his opinion in respect to the testator's memory. What actually occurred when the testator signed his name to the codicil, according to the account of it given by the other witness, Clemmons, which is more consistent, intelligent and reasonable than that given by Abel Bohlsen, does not authorize the belief that the testator's memory was then impaired to any extent.

The statement of Clemmons is that the testator when he signed his name was lying in bed on his back at an angle of perhaps forty-five degrees, that the paper was placed upon a book or some other support and that he then took the pen and wrote his name, making a dash under it to the left as was his habit. But on account of the position of his pen the ink ran back from the point before the completion of the signature, leaving the letters "sen" and the dash unmade or indistinct, but that when the witness called his attention to the fact, he changed the position of the pen so as to let the ink flow to the point and enable him to complete the signature, which he readily did. This witness states that he held the paper and was looking as closely as the testator when he wrote his name, and then discerned that he was physically weaker than he had supposed, and that his hand was a little tremulous. The difficulty the testator had in supplying the omitted letters of his name as described by the witness, Abel Bohlsen, may with as much reason be attributed to a defect of vision, or physical weakness, as to lack of memory. But it is impossible to reconcile the incident as described by Clemmons with a want of either reason or memory.

After he had given his evidence and retired, Abel Bohlsen was at his own request recalled, and stated that when he gave the signing of the testator's name as the only reason for doubting the will, he did not then think of it, but that his main reason was that the testator did not change the church money which seemed to bother him the night before. There is no direct evidence that the testa-

tor exacted from his son a pledge to carry out his wishes in respect to the gift to the church. But the fact that the son when he came to make his will made the gift of the lot and money absolute instead of conditional, as it was in the will of 1876, affords a reasonable inference that no provision was made in the codicil in reference thereto, because the testator became satisfied his son would do so, and rebuts the presumption that the omission was the result of failing memory or reason.

Two other witnesses were introduced by the contestants who expressed the opinion that the testator had not capacity to make a will. But neither of them was present or undertook to state what his mental condition was when the codicil was made. The acts and conversation of the testator referred to by them and upon which they based their opinion took place the night before, and at most show only such temporary delirium or fitful deliriums as are the usual incidents of typhoid fever, with which he was afflicted and which they testify was higher in the night than in the day time, and afford no evidence whatever that he was irrational or incapable of making a will at the date of the codicil.

It appears that Theodore Bohlsen, Jr., had the consumption, and that the testator had reason to believe his early death was probable, and it is argued that the change of the codicil so as to give his dying son the absolute right to the property devised to him affords evidence of want of capacity. A change of purpose is never of itself conclusive of an unsound mind. On the contrary a change as just and reasonable as the one made in the codicil affords strong evidence that the testator is in full possession of all his mental faculties. The provision in the will of 1876, making the devise to the testator's son void in case of death without issue before arriving at the age of twenty-five years was unusual and harsh. It was therefore not unreasonable but natural that the testator on his death bed desired his son, even if he had probably but a short time to live, should be solaced with the reflection that his father no longer doubted but confided in his capcity and discretion, and was anxious to leave him in full control and enjoyment of the estate intended for him.

The evidence in this case is in our opinion conclusive that the testator was of sound mind when the codicil was made and published by him. The only remaining inquiry, therefore, is whether

the alleged errors of the court in the conduct of the trial were such as prejudiced the substantial rights of the appellants.

1. The court permitted the judgment of the county court probating the will and codicil to be read as evidence to the jury. It is recited in that judgment that the codicil was produced in court and proved by the oaths of J. L. Clemmons and A. Bohlsen, the subscribing witnesses thereto, and the reading of the record as evidence tended to discredit and contradict the latter as a witness before the jury. But even if the action of the lower court was irregular, we do not perceive how appellants were prejudiced thereby because it was competent for the propounders to show by the witness himself, on cross-examination, as was done, or otherwise, the same fact that was established by the records of the county court.

2. The fourth instruction is as follows: "If the jury believe from the evidence that the paper writings dated Aug. 16, 1876, and Nov. 30, 1880, purporting to be the will and codicil to the will of Theodore Bohlsen, Sr., were subscribed by said Bohlsen in the presence of the two subscribing witnesses, and that they subscribed their names as witnesses to said writings in his presence and in the presence of each other at his request, and that at the time of subscribing said writings said Bohlsen understood what he was doing and had an intelligent comprehension of the disposition he was making of his property and of the objects of his bounty, they should find that the paper writings are his will and codicil." The objection made to this instruction is that the jury was not required by it to find in the language of the general statutes that the testator was of "sound mind." Gen. Stat. 1883, ch. 113, § 2. A sound mind in the meaning of the statute is testamentary capacity, and it is the duty as well as province of the court to instruct the jury what quality or condition is sufficient to constitute a sound mind of testamentary capacity. This was done in the instruction. Besides in the 6th instruction the jury was informed "that the degree of soundness of mind required by law to enable a person to make a will is capacity sufficient to know his relatives, the extent and character of his estate, and to dispose of the same in a rational manner according to a fixed purpose of his own." Thus the jury was instructed substantially in the language of the statute as to the soundness of the testator's mind, and also as to the degree of soundness required to be proved in order to establish a will.

3. By the 6th instruction the jury were told that if the will and codicil were attested and subscribed as set forth in the fourth instruction, the burden of proof was upon the contestants to show that at the times they were subscribed and witnessed the testator was wanting in mental capacity, or that his signature was obtained by fraud or undue influence. In the case of *Milton v. Hunter*, 13 Bush (Ky.) 163, this court held that "When the propounders of a will have proved the due execution of a paper not irrational in its provisions nor inconsistent in its structure, language, or details with the sanity of the testator, the presumption of law makes out for them a prima facie case, and the burden of showing that the testator was not in fact of sound and disposing mind and memory at the time of the execution of the will is shifted upon the contestants."

4. It was an error of the court to instruct the jury that they should receive with great caution the testimony of an attesting witness against the testamentary capacity of the testator, because it was an invasion of the province of the jury, who are the sole judges of the weight of the evidence and the credibility of witnesses.

5. For the same reason the instruction "G" asked by the contestants was properly refused by the court. The court had already instructed the jury that they must, before finding for the propounders, believe the will and codicil were duly executed, and what was necessary for the due execution; also that they must believe that the testator was of sound mind and what constituted a sound mind in the meaning of the statute, and it would have been both unnecessary and misleading to give prominence to any particular circumstances or facts connected with the execution.

Although the court erred in giving instruction 7, the substantial rights of the contestants were not prejudiced thereby, for the legal evidence in the case is so conclusive of the due execution of the will and codicil, and the testamentary capacity of the testator, that if the verdict of the jury had been otherwise we should have felt constrained to decide it flagrantly against the evidence. For the jury would not have been authorized to find against either the will or codicil upon the evidence of Abel Bohlsen, even if it had been fully credited and uncontradicted.

The judgment must be *affirmed.*

*R. C. Davis, Matt O'Dougherty, E. E. McKay, for appellants.*

*J. L. Clemmons, E. W. Hines, for appellees.*
[Cited, *Hoerth v. Zable,* 92 Ky. 202, 13 Ky. L. 470, 17 S. W. 360.]